1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
**For the Northern District of California**

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

THE THOMAS KINKADE COMPANY, f/k/a
MEDIA ARTS GROUP, INC., a California
corporation and RICHARD F. BARNETT,

          Plaintiffs,

    v.

KAREN HAZLEWOOD, JEFF SPINELLO, and
THOMAS KINKADE AT THE DOWNTOWN
MALL, LLC, a Virginia corporation,

          Defendants.

_____/

No. C 06 7034 MHP

**MEMORANDUM & ORDER**
**Re: Plaintiffs' Motion to Vacate**
**Award of Attorneys' Fees and Costs**
**and Request for Attorneys' Fees**

       Plaintiffs The Thomas Kinkade Company ("TKC") and Richard F. Barnett (collectively

"plaintiffs") have appealed an arbitration award issued in favor of Karen Hazlewood, Jeff Spinello

(together, "the Hazlewoods") and Thomas Kinkade at the Downtown Mall, LLC (collectively

"defendants") in October 2006.  Plaintiffs have previously moved to vacate the substantive portion

of the arbitration award, and now move to vacate the award of attorneys' fees and costs.

Additionally, plaintiffs seek an award of their own attorneys' fees.  Having considered the

arguments of the parties and for the reasons set forth below, the court enters the following

memorandum and order.


BACKGROUND[1]

       The background of the dispute between plaintiffs and defendants is set forth in this court's

previous order, [CITATION].  The action before this court arises from an arbitration award issued in

favor of defendants in October 2006.  The Arbitration Panel ("the Panel") consisted of three

arbitrators, and the Final Award was issued by a 2-1 vote.  In addition to awarding $860,000 in

damages, the Majority added $900,000 in attorneys' fees and costs.  The panel also allocated

$200,000 of defendants' non-neutral arbitrator compensation to be paid by plaintiffs, and included

awards of administrative fees, witness fees, and an allocation of the neutral arbitrator's

compensation.  Plaintiffs now move to vacate the award of attorneys' fees and costs on the grounds

that the award was procured by fraud on the part of defense counsel ("the Yatooma Firm").  The

relevant facts related to the award of attorneys' fees and costs are set forth below.

I.      The Arbitration Proceeding

        The Panel determined in February 2005 that defendants were the prevailing party in the

arbitration, and directed defendants to file an application for attorneys' fees and costs.  The

following month, defendants filed a written request for attorneys' fees, costs, expenses and interest

("the Fee Application"), seeking more than $2.5 million in fees and costs.  First Levitt Dec., Exh. 55.

Although the Fee Application included bills and cost records, there were no declarations affirming

the accuracy or authenticity of these supporting documents.  Id.

        In response to the Fee Application, plaintiffs requested that the panel allow them to conduct

discovery related to defendants' purported fees and costs.  Specifically, plaintiffs sought the

production of written fee agreements, contemporaneous timesheets and pre-bills, and depositions of

defendants, the person most knowledgeable at defense counsel's law firm and Norman Yatooma, the

principal attorney at the Yatooma Firm regarding the preparation of the bills at issue.  Second Levitt

Dec. ¶ 47.  While this request was pending, the panel ordered defendants to provide plaintiffs with

"all documents pertaining to any fee and/or cost arrangement between Claimants or either of them

and counsel for Claimants, together with an accompanying affidavit under penalty of perjury

confirming that these documents constituted all of the binding agreements between the Claimants or

either of them and Claimants' counsel."  In response, defendants produced two fee agreements

containing the following relevant provisions: first, that defendants agreed to pay an hourly rate of up

2

1    to $425, and second, that all services performed after December 14, 2004 were to be billed on a pure

2    contingency basis.  First Levitt Dec., Exhs. 94–95.

3         In the meantime, defendants filed an opposition to plaintiffs' discovery request, claiming that

4    gathering, redacting and producing several years' worth of timesheets would be unreasonably

5    burdensome.  First Levitt Dec., Exh. 96.  The panel nonetheless granted plaintiffs' discovery request

6    in essentially all respects.  The following day, defendants filed a motion for reconsideration directed

7    at the portion of the discovery order requiring the production of contemporaneous timesheets.  The

8    motion discussed at length the burdens that the timesheets requirement would impose on the firm,

9    claiming that "[a]ssuming an average of seven staff members billing time to this matter since May

10   21, 2003, approximately . . . 5,845 distinct daily time sheets were created in the period from May 21,

11   2003 to the present date."  First Levitt Dec., Exh. 97 at 3.  The motion further stated that, if the

12   Yatooma firm were devote four attorneys working ten hours per day to the "Herculean task" of

13   producing the timesheets, it would take at least fifteen days to complete.  Id.

14        The panel denied defendants' motion for reconsideration and once again ordered the

15   production of contemporaneous timesheets.  First Levitt Dec., Exh. 98.  The Yatooma firm initially

16   produced fewer than fifty pages of documents, and produced an additional 279 pages on the eve of

17   one of the depositions ordered by the Panel.  Second Levitt Dec. ¶ 57, Exhs. 14–15.  The Yatooma

18   firm did not produce any timesheets or pre-bills.

19        Plaintiffs then deposed Mr. Yatooma.  Mr. Yatooma testified that all contemporaneous

20   timesheets were deleted from the firm's computer as a matter of course, and that there was no

21   written record of the time recorded by the attorneys in the arbitration except what had been attached

22   to the Fee Application.  First Levitt Dec., Exh. 89, Yatooma Dep. at 6–7.  Mr. Yatooma further

23   testified that the bills attached to the initial Fee Application were copies of what had been sent to

24   defendants and were not "recreated after the fact."  Id. at 16:20–22.  The testimony of Sarah

25   Smigels, the firm's office manager, was consistent with these claims, stating that she received time

26   submissions via email or telephone, entered them into a time recording program called PC Law Jr.,

27   and then deleted the emails.  First Levitt Dec, Exh. 92, Smigels Dep. at 25.  The final arbitration

28

UNITED STATES DISTRICT COURT
For the Northern District of California

3

UNITED STATES DISTRICT COURT
For the Northern District of California

award accepted these assertions, concluding that "[t]here are no contemporaneously created time sheets or pre-bills," but rather that "time was communicated by e-mail or tape to the office manager who transferred that time to billing statements and then erased the tapes and deleted the e-mails." First Levitt Dec., Exh. 1 at 13 (hereinafter "Final Award").  Lacking "reliable" evidentiary support for defendants' Fee Application, the panel made its own determination of "the reasonable fee based on the scope of the representation, the extent of the effort, the appropriate hourly rates for counsel and staff and other relevant factors, including the discussion of sanctions," and awarded $900,000 in attorneys' fees.  Id. at 14.  This award represented slightly more than one third of the approximately $2.7 million that defendants ultimately requested, the amount having increased from the original $2.5 million during the course of the proceedings related to the fee request.

Plaintiffs subsequently brought this appeal pursuant to the Federal Arbitration Act, 9 U.S.C. sections 1 et seq.  On January 8, 2007 plaintiffs moved for limited discovery related to defendants' attorneys' fees.  This court granted plaintiffs' motion, and plaintiffs conducted discovery thereafter. Thomas Kinkade Co. v. Hazlewood, No. C 06 7034 MHP, 2007 WL 217384 (N.D. Cal. Jan. 25, 2007) (Patel, J.).  According to plaintiffs, evidence obtained subsequent to the arbitration proceeding, as a result of this court's order and otherwise, establishes that the Yatooma Firm made misrepresentations to the Panel in support of their Fee Application that warrant vacatur.

Plaintiffs focus on five principal allegations of deceit on the part of defendants and defense counsel.  First, plaintiffs claim that the Fee Application did not accurately reflect the amount of time defense counsel spent on behalf of defendants in the arbitration, and did not accurately reflect the dollar value of the fees that defendants had been billed or were obligated to pay.  Second, plaintiffs assert that the Yatooma Firm improperly withheld critical documents, namely the contemporaneous timesheets, that would have demonstrated to the Panel that the Fee Application bills were inaccurate. Third, plaintiffs allege that Mr. Yatooma and Ms. Smigels committed perjury by testifying that contemporaneous timesheets had been deleted in the ordinary course of business.  Fourth, and relatedly, plaintiffs assert that Mr. Yatooma and Ms. Smigels committed further perjury when they represented that the Fee Application bills accurately reflected the amount of attorneys' fees incurred

4

UNITED STATES DISTRICT COURT
For the Northern District of California

1   in the arbitration.  Finally, plaintiffs claim that defense counsel committed billing fraud by seeking

2   to recover attorneys' fees that had already been paid, or would be paid, by other clients of the firm

3   who were also involved in litigation against the Media Arts Group.  The evidence cited by the

4   parties relevant to each allegation is discussed below.

5

6   II.      Accuracy of Fee Application Bills

7          Plaintiffs claim that the bills submitted with the initial Fee Application were different from

8   the bills actually sent to defendants.  Second Levitt Dec. ¶¶ 71–75, 85–86, Exh. 18 at 2298–2329,

9   Exhs. 25–26; First Levitt Dec., Exh. 55 at 4449–79, Exhs. 33 & 109.  Exhibit 18 to the Second

10  Levitt Declaration is apparently a set of "genuine" bills taken from the client file, and are consistent

11  with the contemporaneous timesheets.  However, these time entries are inconsistent with the bills

12  submitted with the Fee Application.  Second Levitt Dec. ¶¶ 25, 32, 81–82, Exh. 18 at  2298–2329.

13  Plaintiff has prepared two charts setting forth the alleged discrepancies between the Fee Application

14  bills and the authentic bills, as well as the allegation that portions of the claimed attorneys' fees had

15  already been paid by other clients.  Second Levitt Dec., Exhs. 25 & 26.  Comparing the two

16  documents independent of the charts, there are numerous entries which are identical in terms of their

17  date, description, and billing attorney, but with large discrepancies between the hours allocated on

18  the two documents.

19         As one example of such a discrepancy, the first entry in the genuine bills is for 1.25 hours of

20  work by attorney Joseph Ejbeh described as "Reviewed documents produced by Media Arts in

21  preparation for depositions of Media Arts' witnesses."  Second Levitt Dec., Exh. 18 at 2299.  The

22  Fee Application bills contain an identical entry except that the hour figure is given as 13.75, rather

23  than 1.25.  First Levitt Dec., Exh. 55 at 4449.  Reviewing the first page of each set of bills, plaintiffs

24  allege that six of the eight entries are multiplied by a factor of 7, 9, 11 or 15.  In addition to the

25  inconsistencies regarding the hours spent, plaintiffs further claim that Mr. Yatooma improperly

26  requested an hourly rate of $425, when he actually charged a lower rate.  Second Levitt Dec. ¶¶ 22,

27  23 & 43, Exhs. 2 & 9; First Levitt Dec., Exh. 55.

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1    Defendants' explanation for the hour discrepancies is that the bills submitted to the

2    arbitration panel included time for all Media Arts matters, while the bills sent to the Hazlewoods

3    included only the time allocated to them.  Defendants therefore admit that they sought

4    reimbursement from the panel for Media Arts general time, but assert that the panel was fully aware

5    of this.  Because defendants admit the underlying factual allegation, the court must consider

6    evidence related to whether the submission of inconsistent bills to the Panel was proper.  The

7    pertinent issue, therefore, is whether this fact was discoverable and discovered during the underlying

8    arbitration proceeding, or whether it was concealed from the arbitration panel by defendants and

9    defense counsel.

10

11    A.    Hearing Testimony

12    Defendants claim that the Panel was fully aware of their attempt to recover the full costs of

13    services chargeable to Media Arts in general.  During the Panel's hearing on defendants' Fee

14    Application, Mr. Yatooma testified at length regarding the issue.  To begin with, Mr. Yatooma

15    testified that there was "no agreement among those clients," meaning defendants and the additional

16    Media Arts clients, to share costs or expenses.  Defs.' Exh. 7 at 8240:12–16.  However, Mr.

17    Yatooma further testified that he had arranged with plaintiffs' counsel to develop a consolidated

18    discovery schedule so that Media Arts witnesses would not need to be deposed multiple times.  Id. at

19    8240:17–8241:10.  Mr. Yatooma was then asked whether it was "claimants' position that Media

20    Arts, respondents in this case, should pay the full amount of those [consolidated] depositions," to

21    which Mr. Yatooma responded "Yes."  Id. at 8241:25–8242:3.  Asked to explain this position, Mr.

22    Yatooma testified as follows:

23    Because the deposition was necessary, and it was necessary for this
       case, and it would have been necessary for this case even if I did not
24    represent five other Media Arts claimants.
              And because we made this consolidated discovery effort in
25    large part for the convenience of Mr. Levitt's clients, I don't believe
       that entitles Media Arts to a windfall, allowing them to pay one sixth
26    of the discovery costs or at least those deposition costs or fees.
              Now, I certainly can't collect for the deposition of Ken Raasch
27    more than once, that I full well understand, but if Media Arts is going

28

6

UNITED STATES DISTRICT COURT
For the Northern District of California

1

to be required to pay fees because they have been found liable for fraud, they should pay fees for the entire discovery process.

Id. at 8242:5–20.  From this exchange, the Panel at least knew that defendants were seeking attorneys' fees and costs beyond those specifically allocated to defendants.

Mr. Yatooma's explanation prompted Arbitrator Grossman to question him as to the allocation of fees and costs among Media Arts clients.  Because the exchange was somewhat complicated, it is best to reproduce the relevant portion in its entirety rather than attempt to paraphrase the questions and answers:

> MR. GROSSMAN:  What's your plan for the other cases?  How will you charge them?
> THE WITNESS:  As Sarah [Smigels] described, Mr. Grossman, there are — these sorts of items are tracked under a Media Arts general billing code, and *the Media Arts general items have been billed in full on the Hazlewood matter.*
> In the event that, for instance, there is a reimbursement to cover the deposition of Mr. Raasch, then the prorata share in sixths that has been applied otherwise to the other clients would be credited to them.  If this is not — if it is not reimbursed, then every client would then be caused to pay one sixth of that deposition.
> MR. GROSSMAN:  Let me understand that.  Mrs. Hazlewood pays 100 percent and the other people — let's say there are five others or six others, they are each going — or five.
> THE WITNESS:  Six in total.
> MR. GROSSMAN:  Six in total.  Each of them is going to pay their prorata share even if Mrs. Hazlewood has to pay it?
> THE WITNESS:  No.
> MR. GROSSMAN:  No.  If she doesn't have to pay it, then you will allocate one sixth to each one?
> THE WITNESS:  That's right.
> MR. GROSSMAN:  And do the same thing.  If case number two, someone for some reason gives you — reimburses you for those costs, then what, everybody is going to get credited?
> THE WITNESS:  Well, if we are talking about the same depositions, those depositions would not be in a fee application for a second fraud award if they were reimbursed here.
> My point is that we can only collect one time for one deposition.  That deposition, in its entirety, 100 percent of that deposition was necessary for this case, so 100 percent of that deposition is sought for reimbursement here in this case.
> *If 100 percent of that deposition is not reimbursed in this case, the balance of it will be billed accordingly to those clients that benefitted from that deposition.*
> I do not believe, however, that Media Arts should get the benefit of that windfall, the clients should.

7

Id. at 8243:5–8244:25 (emphasis added).  The italicized language is fully consistent with what ultimately appears to have occurred.  The Yatooma Firm billed all Media Arts general matters to the Hazlewood matter, hoping to receive a full recovery of attorneys' fees.  The Fee Application bills contained time entries consistent with billing the Hazlewoods in full for all Media Arts general work.  Because the Panel ultimately declined to award the full amount of fees requested, however, the Yatooma Firm re-allocated the costs among the Media Arts clients, resulting in an altered bill for the Hazlewoods.  Plaintiffs addressed the issue of fee allocation in their brief opposing the attorney fee award in the underlying arbitration, arguing that defendants were not entitled to recover the full costs of consolidated depositions.  Defs.' Exh. 3 at 45.

In response, plaintiffs cite evidence indicating that the Panel was led to believe that only services for which the Hazlewoods were responsible were the subject of the Fee Application.  While discussing one consolidation deposition, Mr. Grossman stated that "we have to understand that Mr. Levitt's clients aren't getting all the fees and then — all the expenses and all the fees for things that really there was an agreement to allocate between various other cases."  Defs.' Exh. 7 at 8168:16–20.  In response, Ms. Smigels testified that "there was no agreement between us and any of the clients, like 'Hey, we have a bunch of Media Arts cases, you guys all get to split the costs.'"  Id. at 8168:21–24.  Ms. Smigels also testified that the "Media Arts general" file was the Hazlewood file. Id. at 8167:9–11.  Elaborating on the mechanics of this arrangement, Ms. Smigels had the following exchange with Mr. Grossman:

> MR. GROSSMAN:  . . . All of Mr. Raasch's 12 hours get charged to the Hazlewood file.
> THE WITNESS:  Right.
> MR. GROSSMAN:  If you recover your costs —
> THE WITNESS:  Correct.
> MR. GROSSMAN:  — then the White people don't pay anything for that deposition, or do you rebill it to them?
> THE WITNESS:  No, we don't rebill, no.  Then the cost would — I mean, we are not going to ask for it two or three times.  That would be credited towards his invoice.
> MR. GROSSMAN:  And how do I know that Mr. — how do I know that it is fair to the Hazlewoods that it all be allocated to them? Because you would have had to do it anyway, is that your answer?

UNITED STATES DISTRICT COURT
For the Northern District of California

1          THE WITNESS:  Right, yeah.  I mean, if we didn't have any
2     other Media Arts cases, we would have still had to do everything that
      we did.

3   Id. at 8169:1–19.  Mr. Grossman's inquiry as to whether this arrangement was "fair to the

4   Hazlewoods" suggests that Mr. Grossman understood the arrangement to be that the Hazlewoods

5   would actually be charged for all Media Arts general fees and costs.  Mr. Yatooma's subsequent

6   testimony clarifying Smigel's statements, however, made it clear that the charges were being

7   allocated to the Hazlewoods only for the purposes of the Fee Application, and that if the Fee

8   Application was not successful the charges would be re-allocated.

9

10          B.          Additional Representations by Defense Counsel

11          The briefs and discovery in the underlying arbitration further support the contention that

12   defendants created the impression that the fees sought were those actually incurred by defendants.

13   In their Fee Application, defendants stated that "Claimants became liable to pay for each service and

14   for each cost."  First Levitt Dec., Exh. 109 at 18.  Additionally, Mr. Yatooma further testified that

15   the bills submitted with the Fee Application—the bills which defendants now admit set forth charges

16   that defendants were not responsible for—"accurately set forth the amount of costs and attorney fees

17   incurred by claimants in the prosecution of this case."  Defs.' Exh. 7 at 8266:4–16 (emphasis

18   added).  Mr. Yatooma additionally denied the existence of "any agreement applied between the

19   claimants in this case and the claimants in any other case against Media Arts to share any costs or

20   expenses of litigation."  Id. at 8240:12–16.  Finally, affidavits submitted by Mr. Yatooma and Ms.

21   Smigels along with their Reply Brief in support of their Fee Application state that the attached bills

22   (those setting forth all Media Arts charges) accurately reflect the charges incurred in working on the

23   Hazlewood matter, not Media Arts matters in general.  First Levitt Dec., Exh. 109 at Exhs. 11 ¶ 21

24   & 12 ¶ 4.  However, as Ms. Smigels' and Mr. Yatooma's testimony above made clear, for the

25   purposes of the Fee Application the Hazlewood matter and the Media Arts general file were

26   coterminous.

27

28

**UNITED STATES DISTRICT COURT**
For the Northern District of California

9

1    Additionally, Mr. Yatooma's deposition testimony from May 2006 indicates that the Fee

2    Application bills were the bills that would be sent to Hazlewood.  Mr. Yatooma testified that "the

3    bills were not recreated" after the fact, and that "the bills that you have are what's on the system."

4    First Levitt Dec., Exh. 89, Yatooma Dep. at 16:20–17:7.

5

6        C.    The Ejbeh Affidavit

7        During his deposition, Mr. Ejbeh, who at one time was an attorney at the Yatooma Firm,

8    testified at length regarding his concerns with the Fee Application and the time attributed to him.

9    According to Mr. Ejbeh, at one point observed a note at the Yatooma Firm detailing the billing

10   protocol for Media Arts matters, stating that 100 percent of Media Arts time should be allocated to

11   Hazlewood, 50 percent to White and 50 percent to the remaining clients.  Second Levitt Dec., Exh. 2

12   at 89:14–23.  Mr. Ejbeh confronted Mr. Yatooma about this note, and Mr. Yatooma confirmed that

13   the allocation was correct.  Id.  The two men then engaged in a heated exchange in which Mr. Ejbeh

14   claimed that the allocation procedure was "not right," and that Mr. Yatooma could not "do that."  Id.

15   at 89:25–90:1.  Mr. Yatooma then explained that he was not planning on collecting the fees multiple

16   time, but that he was "front-loading them on Hazlewood" to prevent "Media Arts and all the

17   racketeers and the crooks that they are" from benefitting from the fact that attorney work product

18   was being shared by multiple clients.  Id. at 90:2–10.  Mr. Yatooma stated that this procedure was

19   necessary to "recover up front all of his fees."  Id. at 90:9–10.  Mr. Ejbeh accepted the truth of Mr.

20   Yatooma's explanation but did not agree that it was an acceptable approach to billing, and stated as

21   much to Mr. Yatooma, leading to further heated arguing between the two men.  Id. at 90:21–91:19.

22       Subsequent to this confrontation, Mr. Ejbeh received an affidavit for his signature attesting to

23   the accuracy of the time attributed to him in the Fee Application.  Mr. Ejbeh refused to sign the

24   affidavit.  On June 20, 2006, Mr. Ejbeh sent an email to an attorney at the Yatooma Firm stating:

25              I have reviewed the billable time that NYA submitted to the Panel that
             is the subject of the Affidavit and compared the time to my billing
26           sheets and records.  The difference is night and day.  I cannot
             reconcile the numbers even under the stated billing policy that Mr.
27           Yatooma described to me last night.  Hence, I cannot sign anything

28

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1

> supporting the billable statements that were submitted to the
> Hazlewood Panel that do not comport with my billable time sheets and
> records.

2

3   Second Levitt Dec., Exh. 17.  According to his deposition testimony, Mr. Ejbeh felt that the time

4   entries attributed to him "appeared to be inaccurate from the standpoint that time entries that were

5   Media Arts general had been upgraded to higher amounts," and that the process that he and Mr.

6   Yatooma "had fought about was indeed implemented and carried out and that's what he [Mr.

7   Yatooma] was arguing for on his fees." Id. at 95:10–16.  Mr. Ejbeh therefore refused to sign the

8   affidavit despite Mr. Yatooma's assurance that he was "'going to tell the panel that [he was] not

9   going to bill twice.'"  Id. at 95:22–23.  The conversation regarding the affidavit ended with Mr.

10  Ejbeh stating that he did not have knowledge of what Mr. Yatooma was doing with respect to the

11  bills, and that he therefore could not sign the affidavit.  Id. at 95:24–96:5.

12      During his deposition, Mr. Ejbeh reviewed the portions of the Fee Application hearing

13  transcripts referenced above, and was asked whether they alleviated his concerns with respect to the

14  bills.  In response, Mr. Ejbeh testified that if Mr. Yatooma disclosed to the Panel that he was "taking

15  100 percent of the Media Arts general time and . . . sticking it into the Hazlewood bill" to recover

16  100 percent of the time from Hazlewood, and further told the Panel that "he will not collect twice

17  and not recover duplicatively . . . and that each client will pay the proportionate share and get a

18  credit if any money comes back," and the Panel "contemplates it and they stick that in their final

19  award, then I don't have a problem with it."  Id. at 285:2–17.  He further testified that he did not

20  have that information when he was given the affidavit in June and therefore could not sign it,

21  because at the time he had no way of knowing what representations Mr. Yatooma would make to the

22  Panel.  Id. at 285:17–24.

23

24      D.    Evidence of Concealment

25      As further evidence in support of their allegation that defense counsel concealed the fact that

26  they were seeking all Media Arts fees rather than only those fees allocated to the Hazlewoods,

27  plaintiffs claim that Mr. Yatooma ordered his staff to destroy evidence that other Media Arts clients

28

11

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1   were obligated to pay large portions of the claimed fees.  For example, plaintiffs have identified an

2   email from Mr. Yatooma to his staff in which he responded to the question, "When I am copying

3   receipts - - should I try to take off other case names (White, Wittman, etc.)?" with "Yes, remove

4   other case names."  Second Levitt Dec., Exh. 3 at 992–996.  Additionally, the descriptions of the

5   time entries were altered in some circumstances to remove references to other Media Arts cases.

6   Mr. Ejbeh's timesheets from March 30, 2005 and March 31, 2005, for example, contain the entry

7   "Attendance at trial testimony of Terry Sheppard to be used in all MDA cases."  Third Levitt Dec.,

8   Exh. 6.  In the Fee Application bills, however, the entry is simply "Attended trial testimony of Terry

9   Sheppard."  First Levitt Dec., Exh. 55 at 4494.

10

11   III.   <u>Contemporaneous Timesheets</u>

12           Plaintiffs claim that newly discovered evidence establishes that defense counsel did, in fact,

13   use and maintain contemporaneous timesheets and pre-bills, and that they concealed this fact from

14   the Panel.  In particular, plaintiffs deposed former employees of the Yatooma Firm who testified as

15   such, and the Yatooma Firm has since produced hundreds of contemporaneous timesheets.  Second

16   Levitt Dec., Exhs. 1–4, 20.  Defendants assert that these timesheets, totaling over 2,000 pages,

17   represents not all or even a majority of the firm's contemporaneous timesheets, but only those that

18   could be located in light of the firm's practice of deleting time entries.  Additionally, defendants

19   claim that these documents are simply print-outs from the Yatooma Firm's billing software, rather

20   than traditional timesheets.  Accordingly, defendants argue, their initial assertion that

21   contemporaneous timesheets were not maintained is not contradicted by the fact that they were able

22   to produce these records.  Defendants further claim that computer printouts were submitted to the

23   arbitration panel.

24           Evidence related to the specific practices of the Yatooma Firm in terms of creating,

25   maintaining and deleting contemporaneous timesheets is muddled by conflicting deposition

26   testimony colored by glaring credibility concerns on the part of certain witnesses.  In her original

27   deposition, Ms. Smigels testified that time was recorded via email or dictation, and the tapes and

28

emails were erased and deleted once the time was input into the billing software.  First Levitt Dec., Exh. 92, Smigels Dep. at 23–25.  Ms. Smigels further testified that, other than the information available on the computer software, there was no written record of an attorneys' time apart from "random emails" that were deleted.  Id. at 25.  Ms. Smigels acknowledged, however, that "the program is ordered in such a way that if you want to print out the time of a specific lawyer on a matter, you can do that," by "simply giving some sort of command to the software."  Id. at 24:19–24.  Ms. Smigels did not mention Excel spreadsheets.

Mr. Yatooma's testimony was largely consistent with Ms. Smigels'.  Mr. Yatooma testified that attorneys at the firm recorded time either by dictation or sending email, and that no written records were kept other than emails and copies of the final bills.  First Levitt Dec., Exh. 89 at 7.  Mr. Yatooma further testified to his understanding that Ms. Smigels deleted the emails after entering them into the system.  Id.  Finally, Mr. Yatooma confirmed his understanding that tapes were erased after being transcribed.  Id. at 8–9.  Mr. Yatooma likewise did not mention Excel spreadsheets.

The claims of Ms. Smigels and Mr. Yatooma regarding the absence of contemporaneous time records are in conflict with testimony from former employees of the Yatooma Firm, each of whom testified to the existence of Excel spreadsheets which allegedly contained contemporaneous time recordings.  Mr. Ejbeh testified that he was able to retrieve all of his 2005 timesheets from the Yatooma Firm's computer systems in Fall 2005.  Second Levitt Dec., Exh. 2, Ejbeh Dep. at 81–82.  In addition to these timesheets, Mr. Ejbeh testified that Mr. Yatooma gave him a large stack of Mr. Yatooma's own timesheets in November 2005, including many of the timesheets that were ultimately produced in response to this court's subpoena, so that Mr. Ejbeh could go over the records and come up with a billing protocol with which he was comfortable.  Id. at 105–108.

Suzanne Connolly, a former office manager at the Yatooma Firm, additionally testified that all attorneys and paralegals at the Yatooma Firm created timesheets using Excel.  Second Levitt Dec., Exh. 1, Connolly Dep. at 72:14–23.  She further testified that hard copies of each employee's timesheets were stored in a filing cabinet, stored by attorney name.  Id. at 73–74.  Connolly stated that this was the practice until she left the firm in April 2006.  Id. at 74:19–25.  Additionally, she

1    testified that she was never instructed to destroy these hard copies.  Id. at 75:1–2.  Finally, Connolly

2    testified that the firm maintained electronic records of the Excel spreadsheets in addition to hard

3    copies.  Id. at 75:3–9.

4        Nicole Polasek, another former employee, testified that, once contemporaneous Excel

5    timesheets were created, they were available in electronic form on the firms' computer system

6    "[u]nless somebody else deleted [them]."  Second Levitt Dec., Exh. 4, Polasek Dep. at 35–36.  She

7    further testified that she had never been instructed to delete contemporaneous timesheets or

8    witnessed anyone else deleting them.  Id. at 36–37.  Polasek additionally testified that, while hard

9    copies of Excel timesheets were printed out if an employee wanted to review them, she did not recall

10   the Excel sheets being printed out for recordkeeping purposes.  Id. at 97.

11       Finally, Matthew Morin, the Yatooma Firm's computer consultant, testified that he could

12   have determined easily whether Mr. Ejbeh's contemporaneous timesheets were available in

13   electronic form, and that deleting emails from Smigel's inbox would not have permanently deleted

14   the records.  Second Levitt Dec., Exh. 5, Morin Dep. at 53:6–54:2, 100:8–17.  Despite this, Morin

15   was never asked to search the computer system for deleted timesheets.  Id. at 89:11–90:11.

16       Without denying the substance of these witnesses' testimony, defendants attack the

17   credibility of two of these witnesses.  Connolly, defendants point out, recently pled guilty to felony

18   charges of larceny and embezzlement from the Yatooma Firm and a charitable foundation founded

19   by Mr. Yatooma.  Defs.' Exh. 8.  Needless to say, there is a great deal of ill will between Connolly

20   and the Yatooma Firm, and Mr. Yatooma himself, that requires this court to question her credibility.

21   Notably, Connolly is the only witness who testified to a systematic method of maintaining both hard

22   copies and electronic versions of the contemporaneous Excel spreadsheets, and the only one to

23   testify that this practice was followed by all attorneys and paralegals at the Yatooma Firm.  In light

24   of the substantial credibility concerns associated with Connolly, the court is hesitant to give

25   dispositive weight to her testimony.

26       Additionally, Mr. Ejbeh had been recently sued by the Yatooma Firm for allegedly taking the

27   firm's clients, and had been enjoined from further client contact and required to repay money to the

28

UNITED STATES DISTRICT COURT
For the Northern District of California

14

Yatooma Firm.  Even if Mr. Ejbeh's testimony were discounted, however, defendants do not deny the authenticity of the hard documentary evidence that he produced—namely, the contemporaneous timesheets that Ms. Smigels and Mr. Yatooma previously claimed were not available.

IV.    Perjury

Plaintiffs allege that Ms. Smigels and Mr. Yatooma committed perjury on two grounds, both of which are related to other fraud allegations.  First, plaintiffs claim that Ms. Smigels' and Mr. Yatooma's testimony as to the Yatooma Firm's practices related to the destruction of contemporaneous time records was perjurious in that Ms. Smigels and Mr. Yatooma falsely denied the existence of these records.  Second, plaintiffs claim that the affidavits authenticating the Fee Application bills, and testimony regarding the authenticity of these bills, were fraudulent in that they falsely represented that the Fee Application bills genuinely set forth the fees assessed against defendants.  The strength of plaintiffs' perjury allegations, therefore, depends on the veracity of plaintiffs' additional claims of fraud.

V.    Duplicative Billing

Finally, plaintiffs claim that defendants improperly sought to recover attorneys' fees that had already been paid by other clients, and concealed that fact from plaintiffs and the Panel.  After this court granted plaintiffs' discovery motion, defendants produced bills sent to other clients for work performed in October through December 2004 which had been listed on the Fee Application bills.  Second Levitt Dec., Exhs. 21 & 23.  The production also included checks from these other clients in payment of the bills.  Second Levitt Dec., Exhs. 22 & 24.  Defendants do not deny that they sought fees and expenses that had been billed to other Media Arts clients, but claim that they fully disclosed that fact to the Panel along with their intent to credit those clients if they recovered those fees in the arbitration proceeding.  However, defendants cite no specific representations to the Panel stating that they had received these payments.

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

LEGAL STANDARD

The Federal Arbitration Act ("FAA"), 9 U.S.C. sections 1 et seq., allows a district court to vacate the decision of an arbitration panel in certain situations, including "where the award was procured by corruption, fraud, or undue means."  9 U.S.C. § 10(a)(1).  "Courts have interpreted this section narrowly, in light of Supreme Court authority strictly limiting federal court review of arbitration decisions."  Todd Shipyards Corp. v. Cunard Line, Ltd., 943 F.2d 1056, 1060 (9th Cir. 1991).  To vacate an award based on fraud or undue means, the party seeking vacatur must show that the behavior constituting fraud or undue means was "(1) not discoverable upon the exercise of due diligence prior to the arbitration, (2) materially related to an issue in the arbitration, and (3) established by clear and convincing evidence."  A.G. Edwards & Sons, Inc. v. McCollough, 967 F.2d 1401, 1404 (9th Cir. 1992) (per curiam).

DISCUSSION

I.      Procedural Challenges

In addition to responding to the substance of plaintiffs' motion to vacate related to attorneys' fees and costs, defendants assert that the motion itself is improper.  Specifically, defendants claim that plaintiffs' latest motion to vacate is inconsistent with the court's previous orders, and untimely under the requirements of the FAA.

Apparently some confusion has arisen from the fact that plaintiffs initiated the instant action by filing a motion to vacate the arbitration award, including the award of attorneys' fees, on November 10, 2006, and subsequently requested discovery as to the issue of attorneys' fees.  In granting defendants' motion, the court contemplated additional briefing related to the attorneys' fee issue, but decided to move forward with the original motion as it related to the balance of the arbitration award.

Plaintiffs filed this motion to vacate the award attorneys' fees on March 12, 2007, the date set by this court for the filing of plaintiffs' opening brief.  In essence, defendants claim that this new motion is improper, and plaintiffs were directed to brief only the issues raised in the November 10,

UNITED STATES DISTRICT COURT
For the Northern District of California

16

2006 motion.  Defendants apparently raise this objection in order to prevent plaintiffs from arguing two issues raised for the first time in the new motion: (1) plaintiffs' request to vacate the award of costs, in addition to the award of attorneys' fees, and (2) plaintiffs' request for an award of their own attorneys' fees in bringing this motion.  In addition to its argument based on the court's orders, defendants assert that plaintiffs were required to assert all grounds for vacatur within the three-month time limit imposed by the Federal Arbitration Act.  9 U.S.C. § 12.

With respect to their first argument, plaintiffs have pointed to numerous instances in their original pleading identifying costs as a part of the award being challenged.  The $900,000 award was an award of "[a]ttorneys' fees and costs."  Final Award at 16.  Likewise, plaintiffs specifically mentioned costs several times in their original Notice of Motion and Memorandum of Points and Authorities, and supporting declarations.  Notice at 1, MP&A at 13.  Accordingly, defendants were on notice from the outset that plaintiffs were challenging the award of costs as well as fees, and defendants' procedural objections fail as to the costs award.

As to plaintiffs' request for their own attorneys' fees, this is a separate request, not part of the original motion to vacate, that arises out of plaintiffs' purported newly discovered evidence of fraud.  This request is properly before the court.

II.   <u>Fraud</u>

Defendants assert that the proper measure of "fraud" sufficient to vacate an arbitration award in this context is "fraud on the court."  The court finds no support for the proposition that the FAA imposes the exacting standard of "fraud on the court" in order to support vacatur, and this assertion is inconsistent with Ninth Circuit authority addressing fraud in the context of the FAA. <u>Compare Dogherra v. Safeway Stores, Inc.</u>, 679 F.2d 1293, 1297 (9th Cir. 1982) (holding that "obtaining an award by perjured testimony constitutes fraud" for the purposes of the FAA, as well as "intentionally giving a false statement to union investigators causing them to drop the grievance until after it was time-barred"), <u>with Appling v. State Farm Mut. Auto Ins. Co.</u>, 340 F.3d 769, 780 (9th Cir. 2003) ("Non-disclosure, or perjury by a party or witness, does not, by itself, amount to fraud on the

**UNITED STATES DISTRICT COURT**
For the Northern District of California

17

1  court."). Fraudulent conduct in the FAA context is conduct which violates Congress' expectation

2  "'that the contractual machinery would operate within some minimal levels of integrity.'"

3  Dogherra, 679 F.2d at 1297 (quoting Hines v. Anchor Motor Freight, 424 U.S. 554, 571 (1976)).

4  Obtaining an award of attorneys' fees by submitting false evidence, or by concealing salient

5  evidence, constitutes fraud.

6

7       A.    Whether the Fraud was Discoverable

8       In granting defendants' discovery motion, this court held that specific instances of fraud

9  which were not presented to the Panel, or discoverable by due diligence, could form the basis for

10  vacatur of the award of attorneys' fees. The issue, therefore, is whether the specific fraud

11  allegations raised by plaintiffs in this motion were presented to the Panel or discoverable during the

12  proceeding.

13       Taken together, plaintiffs allege three fraudulent courses of conduct: (1) wrongfully denying

14  the existence of contemporaneous timesheets and withholding them during the arbitration, (2)

15  submitting false bills in support of their Fee Application, and (3) attempting to recover attorneys'

16  fees that had already been paid by other clients. Defendants claim that each of these issues was fully

17  briefed before the Panel. If this is the case, plaintiffs would be foreclosed from asserting them as

18  grounds for vacatur. A.G. Edwards & Sons, 967 F.2d at 1404 (holding that "where the fraud or

19  undue means is not only discoverable, but discovered and brought to the attention of the arbitrators,

20  a disappointed party will not be given a second bite at the apple").

21

22       1.    Timesheets

23       In opposing defendants' Fee Application, plaintiffs alleged that defendants had lied about the

24  existence of time sheets. Defs.' Exh. 3 at 15–16. However, plaintiffs' original theory of deception

25  was that defense counsel initially deceived the Panel into thinking that timesheets *did* exist, and later

26  admitted that no such records were available. Id. Plaintiffs alleged that defendants lied about the

27  existence of timesheets in order to fraudulently manipulate the Panel and plaintiffs and stonewall the

28

18

discovery process related to attorneys' fees.  Plaintiffs' briefing makes clear, however, that plaintiffs were proceeding from the premise that the timesheets did not exist.  Id. at 16 ("There are no daily time sheets and there never were daily time sheets at the Yatooma Firm.").

Because the facts underlying plaintiffs' new theory were discovered only after the award was issued, when plaintiffs communicated with former employees of the Yatooma Firm and obtained the timesheets themselves through discovery before this court, plaintiffs' allegation that defendants committed fraud in concealing the contemporaneous timesheets is properly presented to this court.


2.      Fee Application Bills

Plaintiffs previously alleged that the Fee Application bills were "bogus" on the basis that by submitting them, the Yatooma Firm was "pretend[ing] that it actually charged for those hours, and misrepresent[ing] that its clients actually paid."  Id. at 12.  The basis for this argument was plaintiffs' allegation that "the Yatooma Firm never billed its clients on an hourly basis, did not send out bills on a monthly basis and it did not get paid current, or at all."  Id.  Significantly, plaintiffs also specifically alleged that the Fee Application bills overstated the amount of attorneys' fees that defendants were responsible to pay.  Id. at 14–15.  Plaintiffs cited to hearing testimony in which Mr. Ejbeh stated that defendants had accrued attorneys' fees in the amount of $818,000 through April 21, 2005, and deposition testimony by Hazlewood stating that Mr. Ejbeh had told her that this figure was the value of attorneys' fees to that date.  Id.  Plaintiffs then cited the Fee Application bills themselves, which purported to show attorneys' fees through April 21, 2005 of $1,449,106.  Id. at 15.  In light of this, plaintiffs asserted that "[t]he Yatooma Firm is not only attempting to outright steal from the Respondents by submitting bogus bills, it is committing a direct fraud on this Court via its misrepresentations."  Id.

These passages in plaintiffs' original opposition brief are strikingly similar to their arguments in the instant motion.  Plaintiffs made the precise argument regarding the Fee Application bills to the Panel that it makes here, i.e. that they were fabricated in order to fraudulently inflate the amount of attorneys' fees to which defendants were entitled.  Plaintiffs cited compelling evidence in support of

this allegation to the Panel.  Plaintiff raises no new arguments in this regard, but only cites additional evidence.  "Newly discovered evidence does not justify vacation of an award."  LaFarge Conseils et Etudes, S.A. v. Kaiser Cement & Gypsum Corp., 791 F.2d 1334, 1339 (9th Cir. 1986).  Furthermore, the Majority explicitly accepted plaintiffs' argument regarding the discrepancy between testimonial evidence and the Fee Application bills themselves as to how much money in fees had been incurred through April 21, 2005.  Final Award at 13–14.  Because the Panel considered whether the Fee Application bills were authentic, plaintiffs may not raise this argument in support of their motion to vacate.[2]

### 3.    Duplicative Billing

Finally, plaintiffs' original opposition addressed the related issues of consolidated billing and whether defendants were responsible for the fees claimed.  Plaintiffs argued that defendants had failed to state in their Fee Application that they paid the fees now sought.  Defs.' Exh. 3 at 24.  Rather, plaintiffs claimed, "[a]t best there [was] conflicting testimony . . . that they *may* have paid $55,000 or $95,000, but none of that is documented anywhere," and defendants were therefore not entitled to attorneys' fees.  Id. (emphasis in original).  Plaintiffs additionally argued that defendants were not entitled to full recovery for consolidated depositions, but that the fees for these depositions should be reduced to defendants' pro rata share among each of the Media Arts clients.  Id. at 45.  However, nowhere did plaintiffs allege that the claimed fees had previously been paid by other clients, nor is there any indication that this fact was discoverable through the exercise of due diligence.  Accordingly, to the extent that defendants fraudulently claimed fees that had already been paid, plaintiffs may raise this argument in support of the instant motion to vacate.

### B.    Material Relationship to an Issue in the Arbitration

To establish a material relationship to an issue in the arbitration sufficient to support vacatur of an arbitration award, plaintiffs must show that the fraud or undue means "caused the award to be given."  A.G. Edwards & Sons, 967 F.2d at 1403.[3]  This inquiry is somewhat complicated in this

20

case due to the fact that the Panel, rather than awarding the amount requested by defendants, arrived at its own number seemingly independent of the evidence and assertions set forth by defendants.  In particular, the Panel's award of $900,000 is "based upon reasonable time and effort which amount is then reduced further by certain amounts for sanctions imposed during the course of the matter against Claimants' counsel."  Final Award at 14.

In reaching this conclusion, the majority stated that the Fee Application bills were not a reliable indication of the actual fees incurred, and strongly suggested a finding that the bills themselves were fabricated.  This holding was supported by two important observations.  First, the Majority accepted plaintiffs' argument regarding the discrepancy between testimonial evidence and the Fee Application bills themselves as to how much money in fees had been incurred through April 21, 2005.  Id. at 13–14.  Additionally, the majority stated that "many of the fee entries are obviously unsupportable."  Id. at 14.  As an example of this, the majority observed that "Mr. Ejbeh claimed to have worked (and billed) exactly 20 hours for 20 straight calendar days including week-ends . . . — a feat that the entire Panel believes is not possible if proper time records were being maintained."  Id.  The Majority further noted its "reservations about the validity of" the billing agreement between defendants and their counsel.

Despite the evidence that defendants had submitted false evidentiary support for their Fee Application, the majority further concluded that "to deny Claimants' Counsel any fees whatsoever would be arbitrary and demonstrate a sense of strong bias in favor of Respondents."  Id.  The dissent rejected this approach, claiming that "[t]he proper remedy when knowingly false support is offered for a claimed reimbursement is to deny the reimbursement entirely rather than to try, as the Majority did, to figure out what was reasonable in the circumstances . . . ."  Dissent at 11.  The dissent therefore would have denied attorneys' fees outright.  Id.

This court addressed this ambiguity in its order regarding plaintiffs' discovery motion, concluding that plaintiffs should be permitted to pursue their fraud allegations regarding the attorneys' fee award, for two reasons.  First, although the Majority's award of $900,000 is purportedly based on the Majority's determination of reasonable fees, elsewhere in the Final Award

the Majority suggests that the award is consistent with the Dissent's agreement to reduce the request by approximately two thirds.  Final Award at 14.  Because defendants' ultimate fee request totaled was $2,669,016.25, the $900,000 is approximately one third of the requested amount.  Id. at 13; Thomas Kinkade Co., 2007 WL 217384 at *1 n.1.  Additionally, the court concluded that, "given the seriousness of the allegations raised by plaintiffs in their discovery request, the court finds that it is likely the panel would have acted differently if such allegations had been raised and proven during the proceedings below."  Id. at *4.  Specifically, the court stated its belief that "[a]t the very least, the panel might have increased its monetary sanctions and reduced its ultimate attorneys' fee award."  Id.

This court, "as guardian of the integrity of the arbitration process and the integrity of the court's confirmation or vacation of the arbitration award," must therefore "satisfy itself" that the attorneys' fee award was reduced by amount consistent with the full scope of dishonest conduct on the part of defendants and defense counsel.  Id.  Accordingly, to the extent that plaintiffs have shown clear and convincing evidence of fraud, this court will reduce or vacate the award of attorneys' fees commensurate with the newly revealed fraudulent conduct.

C.    Clear and Convincing Evidence

There is no doubt that defense counsel took a creative approach to their Fee Application, both in their extraordinary claim that they were entitled to fees that defendants were not responsible to pay, and in the fact that they literally (and admittedly) created false legal bills they had no intention of submitting to their clients.  The Panel, however, understood that both of these things were happening, and adjusted the fee award accordingly.  Furthermore, the fact that defense counsel was requesting fees that had already been partially paid by other clients does not constitute clear and convincing evidence of fraud.  Defense counsel advised the Panel that they were seeking fees that would ultimately be levied against other clients in the event that the Panel did not grant a full award. The Panel understood that any award defense counsel received would be credited to defendants and other clients.  Ideally, defense counsel would have disclosed that certain fees had already been paid,

22

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1   and that therefore a full award would lead them to issue refunds to certain clients.  However, the fact

2   that defense counsel was not entirely candid about this situation did not unduly compromise the Fee

3   Application.  Furthermore, the court finds no reason to require defense counsel to have held off on

4   collecting fees from other clients pending the resolution of their Fee Application.  Accordingly,

5   defense counsel's failure to disclose the fact that they had received payments from other clients does

6   not constitute clear and convincing evidence of fraud.

7           The most glaring inconsistencies lie in the varying representations regarding the availability

8   of contemporaneous timesheets at the Yatooma Firm.  Here too, however, plaintiffs have failed to

9   produce clear and convincing evidence of fraud.  The only witness who testified to a systematic

10  policy of maintaining electronic and hard copies of all timesheets was Connolly, whose credibility is

11  decimated both by guilty pleas to larceny and embezzlement and by personal animosity toward the

12  Yatooma Firm.  The court's doubts related to Connolly's credibility are cast into sharper relief by

13  the fact that her detailed recollections regarding the Yatooma Firm's recordkeeping practices were

14  not corroborated by the other witnesses, including those witnesses hostile to defense counsel.  The

15  remaining testimony to which plaintiffs cite establishes, at best, that there was no set policy

16  regarding the retention of timesheets.  Rather, each timekeeper maintained his or her own records

17  according to personal preference.  While the Yatooma Firm could have recovered its deleted

18  timesheets through simple technological means, plaintiffs could have deduced this from the original

19  testimony and do not appear to have pressed the issue at the time.  Furthermore, the availability of

20  computer print-outs from the firm's billing software has been known to plaintiffs since Ms. Smigels'

21  original deposition.

22          In sum, plaintiffs have not established that the Yatooma Firm's failure to recover its deleted

23  timesheets was the result of intentional deception rather than simple incompetence or laziness.  The

24  Yatooma Firm took a gamble by submitting an excessive fee request without bothering to gather

25  reliable evidentiary support.  In return, the Majority slashed their fee request by two thirds.  Based

26  on the overall equities of the case, the Majority decided that plaintiffs were entitled to an award of

27  attorneys' fees despite the undisguised excesses and fabrications on the part of plaintiffs' counsel.

28

1  Absent clear and convincing evidence of additional, undiscovered fraud, this court cannot disturb

2  that result.

3

4  III.     Undue Means

5          The term "undue means" as used in the FAA "clearly connotes behavior that is immoral if

6  not illegal." A.G. Edwards & Sons, 967 F.2d at 1403.  "[M]ere sloppy or overzealous lawyering"

7  does not constitute "undue means." Id. Although plaintiffs separately argue that the attorneys' fee

8  award should be vacated because it was procured by undue means, their entire argument in this

9  regard is that the Yatooma Firm acted in bad faith in pursuing its Fee Application.  Because

10  plaintiffs have not submitted clear and convincing evidence of immoral or illegal behavior by the

11  Yatooma Firm, they are not entitled to vacatur of the fee award based on undue means.

12

13  IV.     Effect of Vacatur of the Arbitration Award

14          By order dated June 5, 2007 this court granted plaintiff's motion to vacate the arbitration

15  award, based on the Panel's failure to provide plaintiffs with an adequate hearing.  Docket Entry

16  167.  The court ordered the parties to submit supplemental briefs regarding the effect of this vacatur

17  on the instant motion to vacate the award of attorneys' fees.

18          The Panel's decision to award attorneys' fees and costs to defendants was explicitly

19  premised on its determination that defendants were the prevailing party in the arbitration.  Final

20  Award at 12.  Because this court has vacated that determination, the factual predicate for the award

21  of attorneys' fees has evaporated, and the award of attorneys' fees and costs must likewise be

22  vacated.  Appellate courts have reached similar conclusions in reversing district court judgments.

23  See, e.g., Pedigo v. P.A.M. Transport, Inc., 98 F.3d 396, 398 (8th Cir. 1996) (holding that "an order

24  awarding attorney's fees based on a party having prevailed in a trial court cannot survive the

25  reversal of that party's judgment on appeal").  To hold otherwise would be contrary to the provisions

26  of the FAA.  Having determined that plaintiffs were denied a proper hearing, all of the Panel's

27  resulting decisions must be nullified to avoid giving effect to the defective process.

28

**UNITED STATES DISTRICT COURT**
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

Defendants nonetheless assert that they remain entitled to their award of attorneys' fees. First, defendants claim that the fee award was not based on a determination that defendants were the prevailing party. Defendants cite the Majority's statement that "[t]he basis for an award of attorneys' fees in this case is AAA Rule R-43(d)(ii) in that the FAC and the Response and Counterclaim each seek an award of reasonable fees in this proceeding." Final Award at 13. Rule R-43(d)(ii) provides that an arbitration award may include "an award of attorneys' fees if all parties have requested such an award or it is authorized by law or their arbitration agreement." As the dissent noted, however, "[w]hile there is no reference in Rule R-43(d)(ii) to 'prevailing party,' the Majority properly adopts that standard in applying that Rule in order to determine entitlement." Dissent at 10. This is consistent with the Majority's introductory statement regarding its decision to allow defendants to seek attorneys' fees and costs. The Panel clearly would not have invited defendants to file a motion seeking fees and costs had the Panel not first improperly determined that defendants were the prevailing party.[4]

Additionally, defendants claim that the award of attorneys' fees included monetary sanctions against defense counsel, which this court should not disturb. The Majority stated that it arrived at its figure for the fee award based on a host of factors, without providing any detailed analysis. Final Award at 14. It is therefore impossible for this court to determine to what extent, if any, the award reflects monetary sanctions against defense counsel. However, the Majority additionally stated that "Counsel for both sides acted at certain times beneath standards of conduct which this Panel had the right to expect." Id. Accordingly, sanctions against defense counsel may have been offset by, or even exceed, sanctions against plaintiffs' counsel, particularly in light of the drastic reduction that the Majority applied to defendants' initial fee request. Accordingly, this ambiguity in the award does not alter the court's conclusion that the award of attorneys' fees and costs must be vacated along with the arbitration award itself.

V.      Plaintiffs' Request for Attorneys' Fees

1    Generally, the prevailing party in an FAA action may not collect attorneys' fees.  However,

2  "[a] court may assess attorneys' fees 'when the losing party has "acted in bad faith, vexatiously,

3  wantonly, or for oppressive reasons."'" <u>Dogherra</u>, 679 F.2d at 1298 (quoting <u>Alyeska Pipeline Serv.</u>

4  <u>Co. v. Wilderness Soc'y</u>, 421 U.S. 240, 258–59 (1975)).  Such an award "is puntive and the penalty

5  can be imposed only in exceptional cases and for dominating reasons of justice." <u>Id.</u> (internal

6  quotations omitted).  "Within these guidelines, an award of attorneys' fees is within the district

7  court's discretion." <u>Id.</u>[5]

8    As discussed above, plaintiffs' newly discovered evidence shows sloppiness and sharp

9  practices on the part of the Yatooma Firm, but this court cannot say that the level of misconduct

10  warrants the imposition of attorneys' fees.  Accordingly, plaintiffs are not entitled to their own

11  attorneys' fees.

12

13  <u>CONCLUSION</u>

14    While no independent basis under the FAA exists for specifically vacating the award of

15  attorneys' fees and costs, the award cannot stand in light of the vacatur of the arbitration award.

16  Accordingly, plaintiffs' motion to vacate the award of attorneys' fees and costs is GRANTED.

17  Plaintiffs' request for attorneys' fees is DENIED.

18

19    IT IS SO ORDERED.

20

21

22  Dated: July 17, 2007

_____
MARILYN HALL PATEL
United States District Court Judge
Northern District of California

23

24

25

26

27

28

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**ENDNOTES**

1.  Unless otherwise indicated, the background facts are taken from the parties' submissions, declarations, and attachments thereto.

2.  Similarly, plaintiffs are precluded from raising their additional fraud allegation regarding the Yatooma Firm's purported hourly rate.  Plaintiffs claim that defendants' Fee Application fraudulently claimed that defendants were charged a flat rate of $425 per hour, across the board for every attorney in the firm, when the rate for at least one attorney—Mr. Ejbeh—was $375.  Plaintiffs cite testimony from Mr. Ejbeh's deposition in support of this discrepancy.  However, plaintiffs made this precise argument to the Panel in opposition the original Fee Application, citing a letter from Mr. Ejbeh demanding $375 per hour in compensation for a failed attempt at taking a deposition.  Defs.' Exh. 3 at 12–14.  Plaintiffs' renewed argument only adds additional evidence in the form of Mr. Ejbeh's testimony confirming this hourly rate.  Because this argument was made to the Panel, it cannot support vacatur of the award of attorneys' fees.

3.  Plaintiffs appear to rely on Bonar v. Dean Witter Reynolds, Inc., 835 F.2d 1378, 1383 (11th Cir. 1988), for the proposition that the material relation element "does not require the movant to establish that the result of the proceedings would have been different had the fraud not occurred."  This holding appears to be at odds with the Ninth Circuit's causation requirement in A.G. Edwards & Sons, 967 F.2d at 1403.  Because Bonar was decided in another circuit four years before A.G. Edwards & Sons, the court holds that plaintiffs are required to show that the result of the arbitration would have been different had the fraud not occurred.

4.  Defendants separately argue that the Panel had independent authority to award attorneys' fees because both parties consented to such authority by request attorneys' fees.  See Coutee v. Barington Capital Group, L.P., 336 F.3d 1128, 1135–36 (9th Cir. 2003).  While the parties in this action clearly consented to granting the Panel authority to award attorneys' fees, the ultimate award must still be supported by a fair hearing.

5.  Defendants argue that attorneys' fees in the FAA context are available only within two narrow exceptions.  However, the discussion of attorneys' fees in Dogherra was not premised on either of these exceptions, and there is no reason not to interpret its guiding language as generally applicable.

27